Good morning, Your Honors. My name is Kelsey Beckner. I represent Ms. Jacqueline Andrade de Chavez and her son, Ronald, who are both citizens and natives of El Salvador. I would like to reserve three minutes for rebuttal. The petitioners are asking that their petition be regranted and the case be remanded on an open record because the immigration judge's adverse credibility determination and the board's adoption of that adverse credibility determination is not supported by substantial evidence. Your client told a number of different stories about what she was claiming, what the basis for her claim of persecution is. At one point, she claimed that the gangs there were trying to force her into sexual servitude. At the credible fear interview, your client was asked the sort of open-ended question, what will happen if you go back? And her answer was nothing. I do believe that my client did tell a consistent story. She did recite the same facts about being solicited for sexual servitude in her credible fear interview as well as in her immigration court hearing. And I think really the issue that the judge took with her testimony at the immigration court hearing was that she then added details about why the gangs initially contacted her to do that. And that was because of her religious activities. And so I would argue that the credible fear interview was improperly used by the immigration judge in making his adverse credibility determination. He found that he examined the indicia of reliability and in doing so called it an asylum interview. I know the government has called that harmless error, but I've discussed the regulations governing credible fear interviews which say that it is supposed to be a screening. And they explicitly, the forms and everything around the credible fear interviews, indicate that there is going to be additional information provided later. It is not supposed to get all of the information. Can I just follow up on Judge Hawkins' question? So very specifically, when talking about the discrimination she had suffered as a child, as a Christian, where neighbors threw rocks at her when she was 14, the officer asked, what do you think will happen to you if you return because you are a Christian? And she responded, nothing. Times are different and people are different. And her response later was far different and said she would be targeted because she was Christian. That doesn't sound like more detail to me. That sounds like a change in the story. So could you address that? Yes, of course, I can address that, Your Honor. I believe that it actually goes again to my notes are not reliable and that this should not have been relied on for the credibility determination. Let's say we disagree with that and think there are sufficient indicia of reliability. So what then? I would argue that Miss Andrade de Chavez had just entered the United States. She was detained at the time with her young child. And this interview likely took place telephonically. And, you know, she did provide a lot of details in that interview. And I think specifically she when she was asked, will you have problems like you did in the past because you're Christian? She was saying, no, I probably won't be bullied again. I probably won't have rocks thrown at me again. She said they were going to cut her tongue out. I mean, that's very dramatic and specific. Yes, it is. It is dramatic. And I think that the immigration court merits hearing is where an applicant has the ability to present that additional testimony. She was supplementing her testimony with... Wait, wait, wait. There's a difference between saying nothing will happen to me when I go back and they will cut my tongue out. I mean, that's not supplement. That's very different. Well, I think she testified that they threatened to cut her tongue out in the past. And that was, yes, additional testimony that she provided at her individual merits hearing. You know, here's what's odd about this case. I mean, I've been hearing these, in fact, all three of us, we've been hearing cases like this for a very long time. And the paradigm case where the story isn't good enough and then all of a sudden it gets good enough or almost good enough at the actual hearing in front of the ALJ, we see these cases a lot. And if the story wasn't good enough before and all of a sudden it's a good enough story, that's a perfectly legitimate reason for the IJ to say this is not credible. But this one's different. I've never seen one like this. The story that makes this case better doesn't come out on direct. Her lawyer doesn't even know the story. It comes out on cross-examination. So it's not as though she and her lawyer have cooked up this story. And she's never been asked questions like this. And I can just kind of read through the transcript, the government saying, oh, my God, I didn't get an answer I wanted, and then ask another question and get another answer that the government didn't want. So what do we do with the case where this is not your paradigm on direct testimony in a wonderful story? No, we got the same limited story on direct, and it's only on cross. And it's not inconsistent. It is in addition. What do we do with that? Your Honor, I think that I guess if we're saying that the credible fear interview notes have the indicia of reliability, and we're noting that those details were omitted and then added at the individual merits hearing, then I guess it really just depends on the immigration judge's ability to read the room and decide, well, what under the totality of the circumstances actually happened here? And he actually didn't mention demeanor. He didn't mention any of the other... Well, what bothers me about the IJ's decision is that he treated this... Now, if all you do is read the IJ and then read the BIA, this is a garden variety, the story got better case. But this is not garden variety because of the odd way in which this shows up. And there's nothing from the IJ that mentions this, I'll say, oddity. I've never seen it in 20 years. Yes. Yeah. And actually, you're correct. In his decision, he doesn't note this difference between the direct testimony and the cross-examination. Let's assume that we accept your argument that the credible fear answers reasons given is just pushed aside. So your client is now in front of the IJ under oath on direct testimony. In other words, the testimony that she has to the IJ. And she describes three reasons. One is that her classmates will discriminate against her if she's returned, that the gang members said that they had chosen her to be a prostitute for them because she had a holier-than-thou attitude, that the gang members were extorting her father's business, and that a domestic employee of hers or her family stole money and when she reported it to the police, she received a threat that the gang will come get you if you press this. All completely different reasons. How do they mesh? I believe that they mesh in that they show that the overwhelming presence of the MS gang in El Salvador, her story discusses how she traveled to different places to escape the gang and she kept coming into contact with them through various means. It's not like she was seeking it out. They would find her either through her father's business or through this woman who worked in her house and then told her, oh, it was time for her to go into the prison and become a sex slave. So I actually believe this goes to the immigration judge's CAT analysis, which he did actually perform in spite of finding the client incredible and he found that, well, Ms. Andrade just hadn't submitted sufficient evidence to show that the government would acquiesce in the MS gang torturing her and basically that's what she constantly came up against was she reported what happened and the police would say, well, we can't help you. You just need to run. You just need to hide. There's nothing we can do. And so, you know, just her story is trying to find peace and she wasn't able to find it in El Salvador. Did she have access to counsel when the application was filled out, the written application? I do believe that it was completed with the help of counsel at the time. And what did she say in that about religious persecution? There was... Isn't the answer absolutely nothing? Yes, unfortunately, Your Honor. Which is, of course, consistent with her testimony on direct in front of the IJ. That is to say her lawyer, assuming for a moment that her story on cross is true, her lawyer didn't do an appropriate job. Her lawyer didn't understand what was in the case. And that's true for the application, the written application, and it's true for the direct. Yeah. And in fact, the immigration judge pointed in page 204 of the record, well, counsel, you're not helping your own case with that argument. So what we see is a consistent, I don't know if it's failure, but inability to properly represent all the details of Ms. And that argument was made on appeal by counsel. And I believe that the board just dismissed it and said, well, she should have done a Lazada claim. But the counsel's argument on appeal was, well, this should have been considered under the totality of the circumstances. This is something that should have been taken into account when it's so clear. And it looks like I'm at three minutes. You want to reserve it for rebuttal? Yes. Thank you very much for your argument. Thank you. And we'll hear from the attorney general at this time by video, Ms. Martin. Thank you, your honors. Good morning. Good morning. May it please the court, Sarah Martin for the government. Your honors, this court should deny the petition for review because substantial evidence supports the adverse credibility determination here. And even if the record compelled reversal of the adverse credibility determination, the independent cat substantial evidence supports the agency's independent cat analysis. I would just like to briefly speak to some of my opposing counsel's points. They misapprehend the immigration judge's cat analysis here, stating that the petitioner had not submitted enough evidence. In fact, the agency did review what petitioner had submitted and found that she had not established it was more likely than not that she would be tortured at the hands of gang members with the acquiescence of the Salvadoran government. And furthermore, speaking to Judge Fletcher's point regarding whether this came up on direct versus cross, the board did acknowledge that the issue only came out on cross-examination. But in any case, if this was any problem due to prior counsel's assistance, that was not addressed correctly with a Lizada claim, which would have been the correct procedural remedy with any issues stemming from prior representation. In fact, all we have on the record is that petitioner was represented by counsel when she did submit her I-589. And as pointed out by your honors previously, there is no mention of religious persecution in her application for asylum, in her declaration, which is referred to repeatedly, and of course, in the credible fear interview as well. In addition, as Judge Ikuda pointed out, this is not a mere embellishment, or sorry, this is not just a mere additional detail. This is an entire sea change in petitioner's story. Religious persecution would be a basis for seeking asylum in the United States. And here, petitioner has added on that claim only before the immigration judge. And while she would argue that this credible fear interview is only a threshold matter, as she's laid out in her briefs, it's only a screening, those are some of the arguments that she makes. But when she was asked directly about the harm that she alleges she faced, she was asked what the reason was for it was because of monetary reasons, it was because of the business that she and her family owned. And then later, when directly asked, did anybody target you based on your religion? She stated, she referred to an event that happened when she was a minor, but again, cabined the discussion to that happened when I was a minor. When asked, do you think something like this would happen to you again? Would you be harmed because you were an evangelical Christian upon returning to El Salvador? She said, no, I don't think anything would happen. Times change and people are different. Can I interrupt for just a minute? Yes. You said that she was asked, were you targeted because of your religion? Actually, she wasn't asked that. She was asked, were you harmed because of your religion? And she answered, yes, when I was 14, they threw rocks at me. She was not asked, and I recognize that what we're dealing with is a translation and to focus on the precise words is maybe a fool's errand, but the words are all we have. She was not asked in that screening interview, were you threatened? She was asked, were you harmed? And then I think a reasonable understanding of the question to her was, okay, is this going to happen again? And she said, no, times have changed. Well, if she had been asked, were you ever threatened? Well, maybe she would have answered what she answered on cross because those were threats. With respect, Your Honor, on page 490 of the record, in the credible fear interview, there's the question, have you ever been harmed or threatened because you are a Christian? Her answer was yes. And she referred to the rock-throwing incident when she was, I believe, around 12 years old. And then any other times when you were harmed because you were a Christian on that same page? And she said only with those same people when I lived in that neighborhood, which is, I believe, referring to her childhood. On the following page, what do you think will happen to you if you return because you are Christian? Nothing. Times are different and people are different. Have you ever seen a case like this one where the story gets better only on cross and the lawyer representing the applicant doesn't seem to understand the story or would have brought it out on direct? It is surprising, Your Honor. Again, if there were issues with the representation that she had received, those should have been properly addressed in a lasada claim. As the record, as it stands, it's very difficult for the court to have to make a decision here based on petitioner's arguments that some of the record is tainted by poor representation and some of the record is not, but all of it goes to prove her claim. That is a very difficult task to lay out in front of Your Honors. And so the proper means to address this would have been if she was dissatisfied with the representation that she had when preparing her I-589, she should have prepared a lasada claim that detailed the ineffective assistance of counsel and showed which evidence should have been sectioned off and separated from the rest of it, which evidence therefore was tainted. And then similar issues, I'm not sure what happened with her counsel, perhaps not knowing that she had a religious persecution claim or in another interpretation, perhaps that was a concerted effort that she did have a discussion about how she was going to embellish her claim. We don't know what happened behind the scenes, just we know that there is a big change on the record evidence in front of us from her initial story to her later story. So I have a question about the IJ asked her, why did you leave out this information? And instead of answering that question, she phrased it in this speculative way. Maybe I was nervous, maybe because I was coming from something, maybe I wanted to express my case, but the officer would say stop. What do we do with that sort of speculative explanation? Is that a sufficient explanation and the IJ responds sufficiently? Your Honor, the agency addressed your concern in the board's decision. It states that the IJ didn't have to find plausible any of her explanations and the board's properly cited to Hong Li versus Garland. And Hong Li again talks about, you know, where there were explanations and they weren't sufficient, that didn't impact the adverse credibility holding. But very specifically in that case, where the petitioner was counseled before the IJ, they found that explanations from the petitioner that were not plausible or reasonable were not impacting the adverse credibility determination. So those explanations, the agency has properly discounted them. Yeah. You know what bothers me about this case, and you can hear it already from what I've been saying, and it may be that we simply can't get past the deference that we owe to the decision of the agency, is that as I read through her, the entirety of her testimony in front of the IJ, she testifies with about the same degree of detail and in the same manner, both on direct and on cross. It's a very detailed story on direct, and it's a very detailed story on cross. And were I the IJ, I'd be inclined to believe it because of the consistent manner in which she testifies, as well as because it only comes out on cross. So I'm actually very bothered by this case. It may be that I can't get past the deference that we owe, but that testimony on cross has exactly the same sort of tone as the testimony on direct, level of detail, manner of speaking, and so on. How do you respond to that? I would respond that the specific details that the agency extracted in reaching adverse credibility determination are pretty damning. Whether or not she was consistent once in front of the IJ needs to be put in the context of the post-reality standard, which is comparing to the body of evidence that we have in front of us. So for example, she gave information about being threatened, or she alleged that she was threatened with having her tongue cut out. It's a really frightening thing if it was true, but she only stated that in front of the immigration judge. That somehow didn't come up soon after she had arrived at the border. And we understand Petitioner's comment about, you know, she had only recently arrived. I would point out that there was a border interview separate from this credible fear interview, where she stated she had no fear at all. And she stated she was only coming to Seattle to live with her husband. But then somewhere in the next nine days, she told DHS, and to their credit, DHS promptly provided her with a credible fear interview. And then she started talking about other harms she'd experienced. Again, the tongue cutting out doesn't come up even nine days later, after her initial interview, where she said she had no fear. Another detail that the agency pointed out was daily notes threatening her based on her religion, telling her to stop. When you compare that, the only other time we have something like this is in her declaration, where she talks about daily notes, telling her to give money to the gangs. Those are kind of different. Why would she not have mentioned her religion there? So, in your honor's perspective, perhaps you see a lot of consistencies. But the agency, our position is that the agency correctly found there was some pretty damning inconsistencies in this case. And that is enough under the Real ID Act, to find that there was an adverse credibility determination here. Yeah. Unless you have something further, or my colleagues have questions. Thank you so much for your time. And in conclusion, the government requests that this court deny the petition for review for the reasons outlined here. Thank you for your argument. Now, I think we do need to lower the podium. Oh, it does look higher. No, it's this. Oh, okay. Your honors, I would like to start my rebuttal by addressing the government's arguments about the whether the IJ properly addressed the petitioner's explanation about the alleged omissions. In fact, as stated by Judge Ikuda, she did say, you know, when asked about it, I was nervous. You know, she didn't say I was nervous, or she said, well, maybe I was nervous. That sounds like she was speculating and coming up with sort of spinning out possible explanations. Did she ever directly testify that she wanted to express her case, but the officer said stop, it was reflected by the record? Or is she just speculating here? It almost sounds like she's talking about someone else, a third party. It is hard to say. I think with the addition of word maybe, it does sound like she's speculating, but we are talking about, you know, language that was translated from Spanish into English. So we don't know exactly what she said, but I mean, she did say she was nervous. And she did say, maybe I didn't feel like I had the chance to give all the answers. And yet, is that reflected in the transcript or in the evidence? Because she seems to be speculating about her own case. Yeah, I mean, that is, I'm actually citing from the transcript. And I probably am citing from the exact place that you cited from where she said, maybe, starting it. And I do understand that it does seem speculative. Did she say in the transcript of the credible fear interview, did she ask the officer to stop? Or did the officer tell her to stop? I don't believe that's reflected in the credible fear interview notes, no. And then turning to the IJ's response, the IJ said, these questions are open-ended, they're very detailed, so I'm having trouble buying that you were maybe nervous when you spoke to the asylum officer because you provided so much other detail. How do I know you're not embellishing your claim? Was that sufficient, a sufficient response, or if it was insufficient, why? Well, I just, if he was able to say that in the transcript, I don't understand why he wasn't able to just write that in his decision. It would have added a sentence or two to his decision, and yet he didn't address it at all. He could have said that exact same thing in his decision, and then we would have had some type of reason about why he rejected her explanation. And yet, we don't have that in the decision. So the BIA said he didn't have to accept her explanation as plausible, which is consistent with the statute, and in fact he did give a reason for not accepting it as plausible. So why is that? What's wrong with that? Well, the board did cite to Hong Lee v. Garland, which in turn relies on Lin Hua Zhang v. Holder, which actually cited to this court's I don't know if I'm saying this right, Shrestha, which actually noted that an IJ is required to consider a petitioner's explanation for inconsistencies as part of an adverse credibility determination. So what we see are a long line of cases saying that this is a basic requirement that the IJ is supposed to give some sort of specific and cogent reason for why they rejected the applicant's explanation. And the immigration judge just didn't give that. And I think Soto Olarte v. Holder is directly applicable to this case. And I think that, again, for this reason, the adverse credibility determination is not based on substantial evidence for that reason. Our questions took you a little over your time. Thank you for your argument. Thank you. Counsel for the Attorney General, thank you for your argument. Thank you both for your briefs. And we'll proceed to that case is argued and submitted.
judges: HAWKINS, FLETCHER, IKUTA